UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:17-cr-00025-TLS-SLC |
| | ) | |
| LUIS CARRERA, *also known as* Luis Carrera Silva | ) ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to dismiss or, in the alternative, to suppress evidence (DE 23) filed by Luis Carrera, also known as Luis Carrera Silva. Carrera seeks to suppress the following evidence: 1.29 kilograms of cocaine discovered by police on April 17, 2017, during a search of a vehicle in which Carrera was a passenger. Carrera contends that he was stopped by police without probable cause to believe that a traffic violation had occurred and that the informant who provided information to police regarding the presence of narcotics in Carrera's vehicle was not reliable. Carrera also asks that the indictment be dismissed.

The motion to dismiss or, in the alternative, to suppress evidence has been referred to the undersigned Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal Procedure 59(b). (DE 26). Based on the following facts and principles of law, and after considering the evidence and arguments, I RECOMMEND that Carrera's motion be DENIED.

### A. Background

On April 26, 2017, Carrera was indicted for violating 21 U.S.C.§ 846(a)(1) for possessing with the intent to distribute cocaine. (DE 14). On May 4, 2017, Carrera pleaded not guilty. (DE 22). On May 10, 2017, Carrera filed the instant motion to dismiss, or in the alternative, to suppress evidence. (DE 23). On May 12, 2017, the government filed a response

to Carrera's motion. (DE 25). The Court held an evidentiary hearing on this matter on June 16, 2017. (DE 30; DE 32).[1] Carrera filed his post-hearing brief in support of his motion on August 25, 2017. (DE 33). The government filed its post-hearing response brief in opposition on September 20, 2017. (DE 34). Carrera filed his reply to the government's post-hearing brief on October 6, 2017. (DE 35).

**B. Findings of Fact**

At the evidentiary hearing, the government offered the testimony of Fort Wayne Police Department ("FWPD") detective Mark Gerardot ("Gerardot"), FWPD K-9 unit officer Matthew Harmeyer ("Harmeyer"), and Drug Enforcement Administration ("DEA") agent Peter Mooney ("Mooney"). Additionally, the government presented Exhibit 1, a photograph of the oil jug in which a kilogram of cocaine was found; Exhibit 2, a photograph of a brick-shaped kilogram of cocaine found inside the oil jug; and Exhibit 3, a CD containing recorded audio of interactions between the government's confidential source (the "C.S.") and Carrera from the night that Carrera was arrested. The testimony of the government's witnesses was not meaningfully contested, and the Court finds each witness's testimony credible and finds as follows:

1. <u>The Investigation of Carrera</u>

Around December 2016, the C.S. contacted Mooney with information regarding a large amount of narcotics that would potentially be delivered by an individual in Hammond, Indiana, to the C.S. (Tr. 64). Prior to December 2016, the C.S. had been arrested for federal drug offenses related to methamphetamine (Tr. 83), and the C.S. was on federal pre-trial release at the time he contacted Mooney (Tr. 64). The C.S. had not provided information as part of a

---

[1] The Court will refer to the transcript of the hearing (DE 32) as "Tr. __."

previous investigation, and Mooney had no interactions with the C.S. prior to December 2016. (Tr. 83).

From approximately December 2016 to April 17, 2017, Mooney monitored text messages and calls between the C.S. and a male Hispanic in Hammond, Indiana, later identified as Carrera. (Tr. 64-65). In these exchanges, the C.S. and Carrera would refer to a "Cadillac," which Mooney, based on his training and experience, understood to mean a kilogram of cocaine. (Tr. 64-65, 67). In one text conversation regarding price, the C.S. and Carrera discussed exchanging "34" for the "Cadillac." (Tr. 66-67). Based on his experience and his familiarity with the market price for cocaine, Mooney understood "34" to mean $34,000. (Tr. 67). At some point, Mooney learned that Carrera would deliver the "Cadillac" to the C.S. in Fort Wayne on April 17, 2017. (Tr. 68).

## 2. The April 17, 2017, Briefing

On the morning of April 17, 2017, Mooney briefed FWPD officers, including Gerardot (Tr. 7) and Harmeyer (Tr. 48), on information that the C.S. provided: That night, a male Hispanic would arrive in Fort Wayne to deliver a kilogram of cocaine to the C.S. (Tr. 7, 67). The plan was for the C.S. and the male Hispanic to meet at the C.S.'s place of work, and then depart for another location, at which time Gerardot would perform a traffic stop on the male Hispanic's vehicle based on probable cause for a separate traffic offense. (Tr. 7-8). However, the FWPD intended to stop the vehicle regardless; pulling the vehicle over for a traffic offense would be a "walled off" stop intended to prevent the C.S. from being compromised. (Tr. 35, 67-68). Once the vehicle was stopped, Harmeyer would use Zaras, his specially trained narcotics dog, to locate the cocaine in the vehicle. (Tr. 7-8, 49).

### 3. Meeting Between the C.S. and Carrera

Before the C.S. met with Carrera on April 17, 2017, he was equipped with a recording device or live "bug." (Tr. 69-70). Mooney and other undercover law enforcement were able to listen to the C.S.'s exchanges with Carrera in real time via this live bug[2] (Tr. 70), and those listening would relay what they heard to Gerardot (Tr. 9) and Harmeyer (Tr. 50). Additionally, the C.S. was in contact with Mooney via text message and phone calls. (Tr. 68, 70-71).

On the night of April 17, 2017, Carrera arrived at the C.S.'s workplace accompanied by two other men. (Tr. 68, 71). Upon Carrera's arrival, the C.S. texted Mooney that Carrera was in a black Saab. (Tr. 68). However, after Carrera arrived, he showed the C.S. to a white car and indicated that the cocaine was in that car, in a container made for holding motor oil. (Tr. 71). On the audio recording, the C.S. is heard asking Carrera, "You got it on you?" and Carrera responds, "Yeah, in the oil." (Ex. 3, 24:18-24:28). During an audible exchange between Mooney and the C.S., Mooney asks, "Is it in the white car?" and the C.S. responds that he saw "it" in the white car (Ex. 3, 27:18-27:49), inside an oil container in the back seat. (Ex. 3, 28:14-28:26).

Mooney then relayed to Gerardot over the radio that the C.S. saw the cocaine in an oil jug in a white older Honda wagon. (Tr. 11-12). At some point prior to stopping the white vehicle, one of the undercover officers relayed the white vehicle's license plate number to the other officers. (Tr. 11).

### 4. The Stop and Search of the Vehicle

---

[2] The C.S. was also equipped with a video recording device, but this could not be viewed by the officers until after the operation was over. (Tr. 76). Therefore, the video itself will not be considered in the Court's analysis of whether the officers had reasonable suspicion to stop Carrera's vehicle because it was not considered by the officers at the time.

4

After Carrera and the C.S. left the initial meeting place, there was some confusion as to where they were going and the two parties were separated. (Tr. 73). While Carrera was en route to reconvene with the C.S., one of the undercover officers, who is not identified by name in the record and did not testify at the evidentiary hearing, called out via police radio that Carrera's vehicle was speeding, going 55 miles per hour in a 45 miles per hour zone. (Tr. 13-14). Mooney authorized Gerardot to stop Carrera's vehicle (Tr. 74-75), and Gerardot, relying on the information provided by the officers on the radio, proceeded to pull over Carrera's vehicle. (Tr. 14, 74).

Gerardot exited his vehicle wearing a full police uniform, and Harmeyer pulled up behind him. (Tr. 14). As Gerardot approached the vehicle, he saw that there were three people in the car making unusual movements: the back seat passenger moved towards the front of the car, then the front seat passenger moved toward the back seat and leaned down towards the floorboards of the vehicle. (Tr. 16). Carrera was the front seat passenger. (Tr. 18). These movements appeared furtive to Gerardot and indicated that the passengers may have been a threat to officer safety, or that the passengers were hiding contraband. (Tr. 16-17).

Gerardot approached the driver-side window, and Harmeyer approached the passenger-side window. (Tr. 14). Gerardot asked the driver for his license, and the driver produced what appeared to be an Ecuadorian driver's license. (Tr. 17-18). Gerardot grew suspicious because the driver stated he had lived in Indiana for 11 years; it seemed peculiar to Gerardot that he would not have an Indiana driver's license. (Tr. 20). Gerardot grew more suspicious when all three occupants said that they lived in Hammond, Indiana, because the car had Illinois license plates. (Tr. 21). Further, although the occupants claimed to be mechanics on their way to a

5

mechanic shop to work on a car, they could not provide Gerardot with the name of the shop they were going to or where it was located. (Tr. 21).

Gerardot received identification cards from all three occupants and then returned to his squad car. (Tr. 22). Gerardot believed that the occupants posed enough of a threat to officer safety to warrant making them exit the vehicle for a pat down. (Tr. 22).

Around this time, Zaras indicated to Harmeyer that he detected the scent of narcotics coming from the vehicle. (Tr. 23). With the occupants now outside the car (Tr. 24), Gerardot and Harmeyer began to search the vehicle. (Tr. 25). Underneath the front passenger side seat of the vehicle, Gerardot saw a white oil container. (Tr. 25; *see also* Ex. 1). Gerardot observed slits in the sides of the container, and he pulled the container out from under the seat. (Tr. 25). The slits in the container were unusual, and Gerardot could feel that there was an object inside. (Tr. 44). The way in which the container was cut allowed it to be opened without manipulating the container's cap (Gerardot described it "like a mouth"), and Gerardot proceeded to open the container using the slits. (Tr. 25). Inside, Gerardot found what appeared to be a kilogram of narcotics wrapped in several layers of plastic wrap and in the shape of brick. (Tr. 25-26; *see also* Ex. 2).

### C. Applicable Law

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

"As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810 (citations omitted). Probable cause exists when "the circumstances confronting a police officer support the reasonable belief that a driver has committed even a minor traffic offense." *United States v. Cashman*, 216 F.3d 582, 586 (7th Cir. 2000); *see also United States v. Smith*, 668 F.3d 427, 430 (7th Cir. 2012). The probable cause standard is an objective one, not a subjective one, and any ulterior motive an officer may have for making the stop is irrelevant. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813); *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003).

Furthermore, probable cause is not necessary for police to conduct a traffic stop for further investigation under *Terry v. Ohio*, 392 U.S. 1 (1968). "To make an investigatory stop, an officer needs only reasonable suspicion supported by articulable facts that criminal activity is afoot." *United States v. Jackson*, 300 F.3d 740, 745 (7th Cir. 2002) (citing *Terry*, 392 U.S. at 30; *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000)). Reasonable suspicion is "some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *Id.* at 745 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

**D. Analysis**

The government argues that the following reasons justify Gerardot's traffic stop of Carrera's vehicle: (1) Gerardot had independent probable cause because the driver of Carrera's vehicle committed a traffic offense; and (2) Gerardot had reasonable suspicion to stop Carrera's vehicle based on the C.S.'s information and the underlying drug investigation.

1. <u>Probable Cause Based on a Traffic Offense</u>

7

a. *Gerardot's Personal Knowledge*

In response to the government's assertions, Carrera argues that Gerardot lacked probable cause because he did not personally witness the traffic offense. Carrera's argument is based on the Indiana state court case *Turner v. State*, 862 N.E.2d 695 (Ind. Ct. App. 2007). In *Turner*, a police officer pulled over the defendant for driving at 55 miles per hour in a 45 mile per hour zone. *Id*. at 698. The issue before the court was whether the stop was reasonable given that the officer who pulled the defendant over was not certain that the defendant was speeding; he believed the speed limit was 45 miles per hour and had only estimated the defendant's speed. *Id*. The court found that the basis for the stop was questionable, and therefore the stop itself "was not reasonable in light of the circumstances and violated [the defendant]'s rights . . . ." *Id*. at 701.

Carrera urges that Gerardot's stop of Carrera's vehicle was unreasonable because Gerardot had less certainty that a traffic offense occurred than the officer in *Turner*. However, as Carrera observes and as discussed *infra*, the fact that Gerardot did not personally observe Carrera speeding is not determinative under the collective knowledge doctrine. Therefore, I CONCLUDE that Carrera's first argument—that the evidence should be suppressed based on Gerardot's lack of personal knowledge of a traffic offense—fails.

b. *Probable Cause Based on the Collective Knowledge Doctrine*

Carrera also argues that Gerardot did not have probable cause to stop Carrera's vehicle under the collective knowledge doctrine. The collective knowledge doctrine provides that "[w]hen law enforcement officers are in communication regarding a suspect, the knowledge of one officer can be imputed to the other officers. . . ." *United States v. Sawyer*, 224 F.3d 675, 680

(7th Cir. 2000) (collecting cases); *see also United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992); *United States v. Celio*, 945 F.2d 180, 183-84 (7th Cir. 1991). The Seventh Circuit recognizes that the collective knowledge doctrine applies in two scenarios: "where police departments or agencies transmit information across jurisdictions, and where officers communicate with each other at the scene of an arrest." *United States v. Harris*, 585 F.3d 394, 400-01 (7th Cir. 2009) (citing *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005)). In order for the collective knowledge doctrine to apply, the following three elements must be satisfied:

> (1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information-or the agency for which he works-must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it.

*United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010) (citation and internal quotation marks omitted).

Carrera takes issue with the second element of the collective knowledge doctrine. Carrera claims that the Court cannot determine whether the undercover officer who called out the traffic offense via radio had the facts necessary to support the level of suspicion required to perform a stop of Carrera's vehicle. Carrera's argument relies on *Arnold v. City of Fort Wayne*, 210 F. Supp. 3d 1055 (N.D. Ind. 2016), a civil case against the City of Fort Wayne and three police officers.

In *Arnold*, District Judge Moody considered the defendants' motion for summary judgment on the plaintiff's section 1983 claims. By way of a brief factual summary, the issues in *Arnold* arose when the plaintiff left a house that was under surveillance for suspected drug

9

activity. *Id*. at 1059. The defendant officers were informed via radio that the vehicle containing the plaintiff was traveling at 38 miles per hour in a 30 miles per hour zone. *Id*. The car was pulled over by one of the officers conducting surveillance, and the officers found $11,000 on the plaintiff. *Id*. at 1060. The plaintiff filed a section 1983 action against the defendants alleging violations of his Fourth Amendment rights against search and seizure. *Id*.

Judge Moody concluded that there was a triable issue of fact as to whether the officers had probable cause to stop the vehicle for a traffic offense. *Id*. at 1063. Judge Moody found that it was possible that the radio transmission that the plaintiff was speeding could have "came from yet another unidentified member the surveillance team, and perhaps it [was] reasonable to infer that the officer witnessed the infraction herself." *Id*. at 1062. However it was also possible "that this information was relayed through [an officer conducting surveillance], who may have received the information from someone else entirely." *Id*. The Court decided that "the source of the information that supplies the justification for a seizure must be sufficiently described such that the court can analyze sufficiency of the information." *Id*. at 1063. Therefore, Judge Moody determined that there was "a disputed factual issue as to whether" the officer who stopped the plaintiff had reasonable suspicion to do so, and thus he denied the defendants' motion for summary judgment on that issue. *Id*.

Carrera argues that the same holes in the chain of communication that were present in *Arnold* are present in this case. Carrera contends that this Court cannot determine whether the undercover officer who called out Carrera's vehicle for speeding had facts supporting probable cause to perform a traffic stop, and therefore, that the officer's knowledge cannot be imputed to Gerardot.

10

Contrary to Carrera's arguments, Gerardot had probable cause to perform a traffic stop of Carrera's vehicle under the collective knowledge doctrine. Importantly, the Court in *Arnold*, which considered the defendants' motion for summary judgment, applied a different legal standard than the Court applies to Carrera's motion to suppress. In a motion for summary judgment in a civil case, a court may not determine the credibility of the evidence; rather, a court may only determine whether there is a disputed issue of fact, affording all reasonable inferences to the non-moving party. *Id*. at 1061 (citations omitted); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Because the instant motion to suppress is in a criminal case, and because the Court must evaluate the credibility of evidence and testimony and rule on disputed issues of fact, Carrera's arguments based on *Arnold* fail.

Here, unlike the court in *Arnold*, the Court must determine the credibility of evidence and witnesses. *See, e.g.*, *United States v. Moore*, No. 1-07-CR-19-TS, 2008 WL 348770, at *7 (N.D. Ind. Feb. 7, 2008) ("The testimony of the detectives was credible and consistent with one another's."). Although Gerardot did have some difficulty recalling the exact speed of Carrera's vehicle as called out by the undercover officer (Tr. 13), overall there was no indication that he misunderstood the radio transmission that Carrera's vehicle was speeding. *See Moore*, 2008 WL 348770, at *7 ("[B]ut there was no evidence suggesting that [the testifying officer] was confused at the time he issued the citation."). Moreover, Mooney confirmed Gerardot's testimony that an officer called out Carrera's vehicle for a traffic offense and authorized Gerardot to perform a traffic stop. Accordingly, Gerardot's testimony was credible as to whether an officer in communication with Mooney and Gerardot observed facts constituting probable cause that Carrera's vehicle was speeding.

Further, in *Arnold*, Judge Moody afforded the plaintiff all reasonable inferences in his favor as the non-moving party. 210 F. Supp. 3d at 1062. Because of those inferences and because it was not clear that the person who called out the traffic violation was a police officer, Judge Moody determined that "there were too many holes to fill" in the chain of police communication. *Id.* Here, Carrera is not entitled to such inferences, but even if he was, Mooney and Gerardot testified that it was a police officer who called out the traffic offense, obviating the concern in *Arnold* regarding holes in the police chain of communication. Moreover, Carrera has not presented any evidence or argument contradicting Gerardot's and Mooney's testimony that his vehicle was speeding. *See United States v. Lyons*, 687 F.3d 754, 768 (6th Cir. 2012) (finding that the collective knowledge doctrine conferred reasonable suspicion to state troopers acting on the DEA's request, even though the troopers "objectively relied entirely on unverified information furnished to them by fellow law enforcement"); *cf. United States v. Coney*, 246 F.3d 850, 857 (8th Cir. 2006) (finding that an officer's testimony that he clocked the defendant's van speeding was sufficient to establish probable cause because the officer had "a reasonable basis for believing the van was speeding"); *Retzlaff v. City of Cumberland*, No. 09-CV-692-SLC, 2010 WL 1780338, at *6 (W.D. Wis. May 3, 2010) ("[T]he '[u]ncontradicted testimony that [an officer's] radar gun indicated that [plaintiff] was speeding' is normally enough to establish probable cause." (second, third, and fourth alternations in original) (quoting *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009))).

Again, "[a] traffic stop does not violate the Fourth Amendment when the police officer has probable cause to believe that a driver has committed even a minor violation of a traffic law." *Smith*, 668 F.3d at 430. I CONCLUDE that the undercover officer's relaying over the

12

radio to Gerardot that Carrera's vehicle was traveling at 55 miles per hour in a 45 miles per hour zone provided probable cause for Gerardot to perform a traffic stop of Carrera's vehicle.

        2. <u>Reasonable Suspicion Based on the C.S.'s Tip and an Ongoing Investigation</u>

Moreover, even if Gerardot lacked independent probable cause to stop Carrera for speeding, Gerardot had reasonable suspicion to stop Carrera's vehicle based on an ongoing investigation and the information relayed by the C.S. Although the officers planned to conduct a "walled-off" stop of Carrera's vehicle that would rely on the local police officers' independent probable cause, reasonable suspicion existed to conduct a stop of Carrera's vehicle for further investigation based on the officers' surveillance and collective knowledge of conversations between the C.S. and Carrera.

To support reasonable suspicion, there must be "'specific and articulable facts which, taken together with rational inferences from those facts,' suggest criminal activity." *United States v. Ruiz*, 785 F.3d 1134, 1141 (7th Cir. 2015) (quoting *Terry*, 392 U.S. at 21-22). Reasonable suspicion is "an objective standard, based upon the facts available to the officers at the moment of the seizure." *Id.* (citing *Terry*, 392 U.S. at 21-22); *see United States v. Wimbush*, 337 F.3d 947, 979 (7th Cir. 2003) ("'Reasonable suspicion' must be based on some objective manifestation that the suspect is involved in criminal activity." (citing *Swift*, 220 F.3d at 506). The standard focuses on "the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and the characteristics of the suspect." *Ruiz*, 785 F.3d at 1141 (citation omitted). Again, if law enforcement officers are in communication with each other, "the knowledge of one officer can be imputed to the other officers under the collective knowledge doctrine." *Sawyer*, 224 F.3d at 680 (collecting cases);

*see also Nafzger*, 974 F.2d at 911; *Celio*, 945 F.2d at 183-84. In determining whether an informant has furnished information to law enforcement to justify a *Terry* stop, the Court should examine factors such as "the amount of information given, the degree of reliability, and the extent that the officers can corroborate some of the informant's information." *United States v. Booker*, 579 F.3d 835, 838-39 (7th Cir. 2009) (citation omitted).

Here, the C.S. provided sufficient reliable information to establish reasonable suspicion that Carrera was involved in criminal activity. The C.S. had been working with Mooney for approximately five months, and in that time, Mooney monitored C.S.'s texts and phone calls with Carrera. Mooney, based on his 13 years of experience with the FWPD and six years of experience with the DEA, understood that when Carrera and the C.S. referred to a "Cadillac" they were discussing a kilogram of cocaine, and that the agreed purchase price for the cocaine was $34,000. Mooney testified that this and other information provided by the C.S. led him to believe the C.S. was reliable prior to April 17, 2017. Thus, when the C.S. predicted that Carrera would meet with the C.S. at his place of work in Fort Wayne on April 17, 2017, to conduct a drug deal, Mooney relayed this information to FWPD officers during a briefing. The C.S.'s predictions regarding Carrera's activity on April 17, 2017, proved to be accurate as Carrera arrived at the C.S.'s place of work and the two discussed the purchase of cocaine in Carrera's possession. This was further confirmed by the audio recording captured by the C.S.'s live bug. Then, Mooney heard the C.S. ask Carrera where "it" was, and heard Carrera respond "in the oil." Once the C.S. was in his car, he reported to Mooney that the cocaine was in a white car, in an oil container. This information was relayed to Gerardot over the radio prior to stopping Carrera's vehicle. Gerardot, therefore, through the collective knowledge of the other officers listening to

the live audio of the C.S.'s bug, had reasonable suspicion that Carrera's vehicle contained drugs and that Carrera was involved in criminal activity. *See United States v. Navarro*, 90 F.3d 1245, 1253-55 (7th Cir. 1996) (finding probable cause for a traffic stop and search where the informant's detailed tip was highly reliable in its own right and also verified by police surveillance).

After Gerardot stopped Carrera's vehicle, he gathered additional facts that increased his suspicion that Carrera and the other occupants of the vehicle were involved in criminal activity. Upon pulling the vehicle over, Gerardot saw the individual in the front passenger seat exhibit a furtive moment. Although all the occupants claimed to live in Hammond, Indiana, the vehicle had Illinois license plates. The driver presented Gerardot with an Ecuadoran driver's license, which Gerardot found suspicious as the driver claimed that he had lived in Indiana for 11 years. Finally, the occupants of the vehicle told Gerardot that they were mechanics on their to work on a car at a mechanic shop, but none of the occupants could tell Gerardot the name or location of the mechanic shop. Gerardot found these circumstances sufficiently suspicious to warrant removing the occupants from the vehicle and patting them down. These facts, considered in totality, constituted reasonable suspicion to continue the investigation of the vehicle following the traffic stop.

Carrera argues that the C.S. lacked sufficient reliability as to provide reasonable suspicion to stop Carrera's vehicle for several reasons. Carrera argues that the C.S. lacked credibility because he was on federal pre-trial release and, therefore, had an incentive to provide false information that would benefit him. The case that Carrera cites for this proposition does not apply here because this is not a situation where the C.S. was attempting to shift blame for the

15

charges pending against him to someone else. (DE 33 at 10 (citing *Williamson v. United States*, 512 U.S. 594, 607-08 (1994) (Ginsberg, J., concurring))). Further, the fact that the C.S. is on federal pre-trial release means that the government would be aware of whether he provided useful information in the investigation of Carrera. Such accountability weighs in favor the C.S.'s tip being reliable. *See Florida v. J.L.*, 529 U.S. 266, 270 (2000) (cautioning that an anonymous tip may lack reliability because the informant cannot be "held responsible if her allegations turn out to be fabricated" (citation omitted)).

Carrera also contends that the C.S. lacked reliability for the following reasons, which will be addressed together: He had not provided information to law enforcement in any past investigations; he had not provided sufficient, verified, predictive information in the investigation of Carrera; and he did not provide information to establish inside knowledge about Carrera. The Supreme Court has recognized that an anonymous informant's tip, which may have "a relatively low degree of reliability," may confer reasonable suspicion depending on the amount of information in the tip and whether it is corroborated or verified. *See Alabama v. White*, 496 U.S. 325, 330-31 (1990). As discussed *supra*, the C.S. provided accurate information regarding Carrera's demographic (male Hispanic), that Carrera would be in Fort Wayne on April 17, 2017, that Carrera was in a white car, that Carrera would meet with the C.S. at his place of work to conduct a drug deal, and Carrera's location after leaving the initial meeting place. Some of these facts were predicted by the C.S. and confirmed prior to April 17, 2017, and some were corroborated in real time or verified by Mooney and other undercover officers observing situation. Therefore, I CONCLUDE that these facts, considered in totality, were sufficient "to establish the requisite quantum of suspicion" for Gerardot to perform a traffic stop of Carrera's

vehicle. *Id*. at 330.

### E.  Conclusion

For the above reasons, I CONCLUDE that Gerardot and Harmeyer did not violate Carrera's Fourth Amendment rights when they conducted the traffic stop. I therefore RECOMMEND that Carrera's motion to dismiss or, in the alternative, to suppress evidence (DE 23) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for each party. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. Fed. R. Crim. P. 59(b)(2).

SO ORDERED.

Entered this 1st day of November 2017.

/s/ Susan Collins  
Susan Collins  
United States Magistrate Judge